Ashok Ramani (SBN 200020)
Micah G. Block (SBN 270712)
Serge A. Voronov (SBN 298655)
Ian Hogg (SBN 313924)
Elaine M. Andersen (SBN 340247)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Tel:    (650) 752-2000
Fax:    (650) 752-2111
ashok.ramani@davispolk.com
micah.block@davispolk.com
serge.voronov@davispolk.com
ian.hogg@davispolk.com
elaine.andersen@davispolk.com

*Attorneys for Plaintiff*
*Magnolia Medical Technologies, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> - against - <br><br> KURIN, INC., <br><br> Defendant. | Civil Action No. **'24CV0428 MMA BGS** <br><br> **COMPLAINT FOR PATENT INFRINGEMENT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Magnolia Medical Technologies, Inc. ("Magnolia"), through its undersigned attorneys, Davis Polk & Wardwell LLP, as and for its Complaint against Defendant Kurin, Inc. ("Kurin"), respectfully alleges, upon knowledge as to itself, and otherwise upon information and belief, as follows:

## SUMMARY OF THE ACTION

1.    Magnolia, a pioneering healthcare technology company, seeks justice against its sole commercial competitor, Kurin, a serial infringer that continues to

COMPLAINT

profit unfairly and without permission by using Magnolia's life-saving, patented inventions.

2.      Kurin was founded on lies and betrayal. Its founder and CEO, Bob Rogers, posed as a friend to Magnolia, while scheming to enter Magnolia's exclusive market—not through his own innovation, but by using Magnolia's inventions without permission and freeriding on Magnolia's years-long major investments in research, development, independent clinical trials, and market education.

3.      In a previous federal trial, a jury found that Kurin's first-generation "Kurin Lock" device uses Magnolia's patented technology without permission. In the same trial, Kurin's CEO, Rogers, testified under oath that he had falsely described Kurin's device to the U.S. Food and Drug Administration. As explained further below, Rogers also testified, incredibly, that he did not know how the Kurin Lock worked *for years* while Kurin sold the device to hospitals and medical practices nationwide, who used the Lock on unsuspecting patients.

4.      Kurin has since doubled down on its predatory business model, announcing a new "Kurin Jet" device. That device plainly infringes Magnolia's patents, as the exemplary allegations in this Complaint demonstrate, including several patents of which Magnolia's CEO notified Rogers, his executive team, and a member of his Board of Directors in a letter sent over a year ago.

5.      On information and belief, Kurin developed, announced, and released its infringing Kurin Jet device with full knowledge that the Kurin Jet uses Magnolia's patented technology, but without seeking permission and a license from Magnolia. And, on information and belief, Kurin began marketing its infringing Kurin Jet device without having submitted to the FDA a 510(k) premarket submission to demonstrate that the device to be marketed is safe and effective.

6. This suit seeks to protect Magnolia's intellectual-property rights and put an end to Kurin's willful infringement.

7. This suit relates to all configurations of Kurin blood-collection sets that Kurin makes, uses, sells, offers for sale, or imports and which include, incorporate, or use the Kurin Jet technology, including the configurations that Kurin markets as Venipuncture Collection Sets, Peripheral IV Collection Sets, and Low-Volume Syringe Collection Sets (collectively, the "Accused Products").

## NATURE OF THE ACTION

8. This is a civil action for patent infringement of U.S. Patent Nos. 9,855,002 (the "'002 Patent"), 10,052,053 (the "'053 Patent"), 11,529,081 (the "'081 Patent"), 11,653,863 (the "'863 Patent"), and 11,903,709 (the "'709 Patent") (collectively the "Patents-in-Suit") under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

## PARTIES

9. Plaintiff Magnolia is a corporation organized and existing under the laws of the state of Washington, with a primary place of business at 220 W. Mercer Street, Suite 100, Seattle, Washington 98119.

10. Defendant Kurin is a corporation organized and existing under the laws of the state of Delaware, with a primary place of business at 10840 Thornmint Road, Suite 111, San Diego, California 92127.

## JURISDICTION AND VENUE

11. This is an action for patent infringement arising under the patent laws of the United States, including but not limited to Title 35 United States Code §§ 271 and 281.

12. This Court has original jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

13.     This Court has personal jurisdiction over Defendant for at least the following reasons: (1) Defendant is present within or has minimum contacts within this Judicial District; and (2) Defendant has committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this Judicial District by its offering of infringing products and services in this Judicial District.

14.     Venue is proper in this District under 28 U.S.C. § 1400(b). Defendant has a regular and established place of business in this District (its principal place of business) and has committed acts of infringement in this District. Further, venue is proper because Defendant conducts substantial business in this forum, directly or through intermediaries, including (1) at least a portion of the infringement alleged herein; and (2) regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in this District.

## FACTUAL BACKGROUND

### A.     Magnolia's Groundbreaking Innovations

15.     Dr. Richard Patton and Gregory Bullington founded Magnolia in 2008 with a singular mission: save lives by eradicating false-positive results in blood tests used to diagnose bloodstream infections like sepsis, the top cause of death in U.S. hospitals.

16.     Sepsis is a serious medical condition that results in high morbidity and mortality. Patients who test positive for sepsis receive aggressive treatment, often requiring prolonged in-patient hospital stays to administer potent, broad-spectrum intravenous antibiotics. The vast majority of these patients are already very ill, immunocompromised, or both. This unnecessary and avoidable antibiotic treatment can itself weaken, and in some cases kill, these unsuspecting and vulnerable patients.

17.     Historically, nearly half of the positive-blood-test results for sepsis were false positives, meaning the test indicated the patient had sepsis when they in

fact did not. Contaminants, for example bacteria on or harbored in the patient's skin, can lead to false-positive test results.

18.    False-positive test results for sepsis often lead to unnecessarily longer patient hospital stays, thus increasing the risk of hospital-acquired infections, while exposing patients to the potential risks and side effects of dangerous and unnecessary medical treatments.

19.    Before founding Magnolia, Dr. Patton had invented technology that diverts a first portion of a blood draw, before collecting a subsequent sample for testing.

20.    Beginning in late 2011, Magnolia began to conceive, make, and test numerous novel devices that would let doctors, nurses, and technicians apply Dr. Patton's groundbreaking technology. In 2013, Magnolia finalized its first-generation commercial product, called Steripath®, using one of these designs.

21.    In the years that followed, Magnolia invested enormous time, effort, and resources to conduct rigorous independent, controlled clinical trials and testing, which definitively proved that Magnolia's patented technology dramatically reduces, and has the ability to eliminate, blood-culture contamination and false-positive test results.

22.    Magnolia has also expended the significant resources required to timely disclose its inventions to the United States Patent and Trademark Office ("PTO"). In return for those contributions to the public knowledge and in recognition of Magnolia's innovation, the PTO has granted Magnolia patent rights to protect its novel and clinically important inventions against unauthorized use.

23.    Magnolia's broad and deep patent portfolio, including the five patents asserted here, cover Magnolia's core ISDD® technology, which is integrated into a variety of devices and systems clinically proven to significantly reduce contamination when procuring bodily fluid samples, including blood.

24.     The asserted patents cover devices and methods that operate through a variety of mechanisms and structures, including the use of pressure differentials, valves, blood barriers, multiple fluid flow paths, and moveable plugs. The covered devices and methods can be paired with existing blood-collection equipment to procure samples of blood and other bodily fluids for testing that results in significantly more accurate diagnostic and patient outcomes.

**B.     Kurin's CEO, Bob Rogers, Acted as a Friend and Advisor While Secretly Copying and Planning to Compete Against Magnolia**

25.     In 2013, when Magnolia was advancing its life-saving devices to commercialization, Kurin did not exist. Bob Rogers, who later founded Kurin, was the CEO of a medical-device company called Ivera, which was not in the blood-diversion space.

26.     During that year, a mutual colleague introduced Magnolia's co-founder and CEO, Gregory Bullington, to Rogers. Based on the recommendation of mutual colleagues, Bullington consulted Rogers on various business matters.

27.     In March 2015, Rogers sold Ivera. When Bullington learned of the sale, he contacted Rogers to congratulate him and also to "give [him] a quick update on [Magnolia's] commercial progress as well as solicit [his] input on [Magnolia's] overall strategy."

On Mar 16, 2015, at 10:30 AM, Greg Bullington <greg.bullington@magnolia-medical.com> wrote:

Hi Bob:

First off, I wanted to congratulate you on consummation of your outstanding M&A transaction. I can only imagine the feelings of accomplishment after having put so much into developing such a successful business.

Second, I am going to be in San Diego next week so wanted to see if I could sponsor lunch, dinner or an afternoon coffee on Wednesday (3/25) or Thursday (3/26). It would be great to give you a quick update on our commercial progress as well as solicit your input on our overall strategy. Additionally, when we raise our Series B (likely Q4), I anticipate expansion of our Board so would be good to understand if you ever consider these types of roles.

28.     Given Rogers' consistent representations that he wanted to help Magnolia given his connection to the company, Bullington felt comfortable reaching out to Rogers, who was neither in the blood-diversion business nor had he ever suggested entering that business, let alone stealing Magnolia's technology and using it to compete against Magnolia.

29.     Magnolia's trust in Rogers extended even to considering him for a board position, which Rogers declined because he was "keen on starting another adventure and [did] not desire to have other commitments impede that objective."

On Mar 16, 2015, at 4:58 PM, Greg Bullington <greg.bullington@magnolia-medical.com> wrote:

Hi Bob:

I totally understand re: distraction associated with potential board position(s), but would still love to get your high-level thoughts on our commercialization strategy.

I'm staying in Del Mar on Wednesday night so lunch on Thursday would be great. If you have a favorite spot that is convenient for you, please let me know and we can get it on the calendar.

Thank you in advance for your time and input — your insights and perspectives will be very helpful.

Best regards,
Greg

**Gregory J. Bullington**
Co-Founder & CEO
DIRECT: 206-673-2502
MOBILE: 206-369-1319
WEBSITE: www.magnolia-medical.com
<A2FE06C9-E3E2-426E-A79D-B775CE19FDBE[23].png>

**From:** Bob Rogers
**Date:** Monday, March 16, 2015 at 1:19 PM
**To:** Greg Bullington
**Subject:** Re: Connecting in San Diego

Greg,

Thank you for the congratulatory note.  You may find this surprising but the sale brings a bag of mixed emotions. There is the triumph all the way down to a deep sense of sadness as this great adventure comes to an end for me and the team.

Next week I am available either day for lunch.  That said, unless you have another reason to be down here it is not necessary for you to travel as we can always do a call and save you some dollars. It's your option, time and money.  As to board participation I am unsure if a) I am well suited for board participation as I am a hands on operator and b) whether or not this is what I want to do at this time. I hope you understand that I am keen on starting another adventure and do not desire to have other commitments impede that objective.  Board position or not I am always happy to listen and offer my positions/thoughts.  Let me know about next week and please begin using my personal email address of brogers3@gmail.com.

Best Regards,

Bob Rogers

COMPLAINT

30.     Magnolia did not and could not suspect that the "adventure" Rogers was "keen" to "start[]" was to steal what he had learned from Magnolia.

31.     On March 26, 2015, Bullington met with Rogers in San Diego. Bullington brought with him the then-current version of the Magnolia Steripath device and showed it to Rogers.

32.     Just days after meeting with Bullington to discuss Magnolia's business and inspect the Steripath device, Rogers surreptitiously began holding meetings with several of his Ivera business associates about founding the company that became Kurin to copy Magnolia's ideas and profit unfairly from Magnolia's inventions.

33.     Throughout their 2015 discussions and interactions, Rogers never hinted to, let alone forthrightly told, Bullington that he was preparing to use Magnolia's own technology to compete directly with Magnolia. Rather, Rogers led Magnolia and Bullington to believe that Rogers remained a trusted advisor, so that he could continue to learn Magnolia's proprietary information on topics such as clinical efficacy, commercial traction, customer response, and market-pricing dynamics.

34.     For example, on November 6, 2015, Rogers left a voicemail for a Magnolia employee, Tamara Johnson, who had previously worked for Rogers at Ivera. In that voicemail, Rogers asked Johnson if Magnolia "ha[d] any studies" because he had heard "[Magnolia] had all these studies that were coming out, and they were due to be completed in 30 days, and I never heard anything about it. So, you know, is there any proof that diversion of the blood is reducing false positives? What evidence does [Magnolia] have?"

**C.     Rogers and Kurin Released a Competing, Infringing Device, the "Kurin Lock," and Made False Statements About It**

35.     This is not Magnolia's first patent-infringement lawsuit against Kurin.

36.     In or around January 2017, Kurin commercially launched its "Kurin Lock" device (approximately three years after Magnolia brought its pioneering, first-generation product to the market in 2014).

37.     Because the Kurin Lock violated Magnolia's patent rights, and because Kurin refused to withdraw it from the market, Magnolia sued Kurin.

38.     In the summer of 2022, Magnolia obtained a jury verdict finding that Kurin infringed Magnolia's U.S. Patent No. 10,039,483 (the "'483 Patent"). Among other aspects of Magnolia's inventions, the asserted claims of the '483 Patent recite a device that "sequesters" an initial portion of blood. Kurin's leading argument in the face of Magnolia's proof at trial that the Kurin Lock infringes Magnolia's '483 Patent was to suggest that its device did not "sequester" blood.

39.     That argument was not only incorrect—it flatly contradicted Kurin's own admissions and testimony.

40.     Kurin had represented to the FDA over and over again that its device "sequester[s]" blood.

> The Peripheral IV (PIV) catheter is connected to the pressure-rated extension set via luer connection.  For initial draw, blood travels through the lumen of the subject device into the blood lock mechanism where the initial draw of blood (approximately 0.15ml) is diverted and sequestered. Refer to Attachment 11.4 for a detailed illustration of the blood lock mechanism. The purpose of the sequestration is to automate the discard volume method (DVM). Once the sequestered volume is diverted and retained, the blood continues travel to the blood culture bottle/vial interface where the blood culture sample is obtained. *Note: The blood collection technology was cleared under 510(k) K162233.*

41.     Rogers himself had certified that the information Kurin submitted to the FDA was "truthful and accurate."

1
2
3
4
5
6
7
8
9
10
11

**6.1 Truthful and Accuracy Statement**

I, Bob Rogers, certify that, in my capacity as Chairman & CEO of Kurin, Inc., I believe to the best of my knowledge, that all data and information submitted in the pre-market notification are truthful and accurate and that no material fact has been omitted.

*Bob Rogers*

_____

Bob Rogers, Chairman & CEO

July 13, 2018
_____
Date

12   42.   Kurin made like admissions about how its device "sequesters" blood
13   elsewhere, including on its website and in marketing materials it used with
14   hospitals, doctors, nurses, and technicians.

15   43.   Despite all these statements, Kurin argued at trial that its device did
16   not "sequester" blood in the manner that Magnolia invented and patented.

17   44.   Because that argument was contrary to Kurin's and Rogers' past
18   statements, Rogers admitted at trial—in sworn testimony—that he had submitted
19   untrue statements to the United States Food and Drug Administration ("FDA") in
20   2016, 2018, and 2019.

21   45.   Then, Rogers tried to explain those statements—incredibly—by
22   asserting that he had been unaware of how his own product operates when he and
23   Kurin described its operation to the FDA.

24   46.   Rogers further testified under oath that he had *still* been unaware of
25   the Kurin Lock's functional properties when he and Kurin began selling the Lock
26   to hospitals for use in intensive-care units and emergency departments where real
27   human lives are at stake. In fact, Rogers testified that he was "not aware of how the
28   product worked until testing was done in [March] 2019" (which he maintained was

COMPLAINT

after he submitted these statements about sequestration to the FDA and after Kurin began selling its device), and that he "*was very disturbed*" when he became aware.

47.     Rogers further testified that, after these tests, he "changed all [of the company's marketing] literature," but made *no attempt to inform FDA* that he had learned that statements in his FDA submissions were false.

48.     In March 2023, months after admitting these prior false statements, Rogers and Kurin made a new submission to the FDA. Despite Kurin's on-going infringement of Magnolia's intellectual property, Kurin used Magnolia's own next-generation device, Steripath® Micro™, as the predicate device for this filing.

49.     Kurin represented to the FDA that there was "equivalence" between the Kurin Lock and Magnolia's proven ISDD technology's clinical efficacy, and did so as the basis of its request for permission to claim in the marketplace that the Kurin Lock device "allows the specimen of blood from the patient to be sidelined prior to the collection of the test sample to reduce the frequency of blood culture contamination when contaminates are present in the initial blood sample compared to blood cultures drawn using standard practice without the Kurin Lock." Exhibit 6 at 5-6.

50.     In these recent FDA filings, rather than simply coming clean about its admitted false statements, Kurin elected not to inform the FDA of its belief, reflected in Rogers' sworn testimony, that its prior FDA submissions about the same product included false statements, increasing the potential that FDA and hospital purchasers would continue to believe them.

**D.     Despite Judgment of Infringement, and While Under Threat of a Pending Request for a Permanent Injunction, Kurin Willfully Markets a New Infringing Product**

51.     As noted above, a federal jury found in the summer of 2022 that the Kurin Lock infringes Magnolia's '483 Patent, rejecting Kurin's numerous non-infringement and invalidity arguments. That case is currently in post-trial motions, and Magnolia's request for a permanent injunction remains pending.

52.     On February 15, 2023, just months after losing a federal jury trial, Kurin announced commercial release of a device it calls the "Kurin Jet." On information and belief, Kurin did so in response to that trial result, and in hope of being able to market a device that had not yet been found to infringe Magnolia's patents.

53.     However, on information and belief, Kurin designed the Kurin Jet with knowledge of Magnolia's extensive patent portfolio, knowing that it clearly and willfully infringes Magnolia's patented inventions.

54.     When Kurin announced the release of the Kurin Jet, it did so without advance notice to Magnolia (nor, on information and belief, the FDA), and then repeatedly refused Magnolia's request for samples of the device so that Magnolia could evaluate the Kurin Jet for infringement of Magnolia's patents.

55.     On February 23, 2023, Magnolia's CEO Bullington sent Rogers, his key executives, and a board member a letter detailing Magnolia's concern about the "Kurin Jet," and reminding them of Magnolia's patent rights. The patents and applications listed in that letter included U.S. Patent Nos. 9,855,002; 10,052,053; 11,529,081; and U.S. Patent Application No. 17/883,340, from which the '863 Patent issued.

56.     Magnolia never received any response from Rogers, Kurin, or anybody else as to its concerns about the Kurin Jet's potential patent infringement.

57.     Rogers testified at trial in July 2022 that he is "always looking at patents." Having already been found by a federal jury to infringe Magnolia's intellectual property, on information and belief, Kurin continued to monitor Magnolia's public applications and issued patents as it scrambled to release the Kurin Jet.

## THE ASSERTED PATENTS

58.     The '002 Patent is titled "Systems and Methods for Parenterally Procuring Bodily-Fluid Samples With Reduced Contamination," and issued on

January 2, 2018, to Richard G. Patton. Magnolia owns the entire right, title, and interest in and to the '002 Patent. A true and correct copy of the '002 Patent is attached as Exhibit 1.

59.     The '053 Patent is titled "Systems and Methods for Parenterally Procuring Bodily-Fluid Samples With Reduced Contamination," and issued on August 21, 2018, to Richard G. Patton. Magnolia owns the entire right, title, and interest in and to the '053 Patent. A true and correct copy of the '053 Patent is attached as Exhibit 2.

60.     The '081 Patent is titled "Fluid Control Devices and Methods of Using the Same," and issued on December 20, 2022, to Gregory Bullington, Jay Miazga, Shan Gaw, and Timothy Ramsey. Magnolia owns the entire right, title, and interest in and to the '081 Patent. A true and correct copy of the '081 Patent is attached as Exhibit 3.

61.     The '863 Patent is titled "Fluid Control Devices and Methods of Using the Same," and issued on May 23, 2023, to Gregory Bullington, Jay Miazga, Shan Gaw, and Timothy Ramsey. Magnolia owns the entire right, title, and interest in and to the '863 Patent. A true and correct copy of the '863 Patent is attached as Exhibit 4.

62.     The '709 Patent is titled "Fluid Control Devices and Methods of Using the Same," and issued on February 20, 2024, to Gregory Bullington, Jay Miazga, Shan Gaw, and Timothy Ramsey. Magnolia owns the entire right, title, and interest in and to the '709 Patent. A true and correct copy of the '709 Patent is attached as Exhibit 5.

## COUNT I

### Infringement of the '002 Patent

63.     Magnolia incorporates the allegations of all foregoing Paragraphs as if fully restated herein.

64.     Kurin directly infringes, and has directly infringed, all claims of the '002 Patent, either literally or under the doctrine of equivalents, by, without authority, consent, right, or license, making, using, offering to sell, or selling within the United States, or importing into the United States, the Accused Products.

65.     As detailed below, the Accused Products practice all elements of at least claim 17 of the '002 Patent. Kurin's infringement of claim 17 is representative of infringement of all Kurin's Accused Products.

66.     Among the claims of the '002 Patent, claim 17 discloses:

A method of using a sample procurement device to obtain a blood sample from a patient with reduced contamination to reduce false results in culture testing of the blood sample, the method comprising:

establishing fluid communication between a lumen-containing device and the patient;

establishing fluid communication between the lumen-containing device and a first fluid flow path;

receiving an initial volume of blood from the patient;

transitioning at a junction between the first fluid flow path and a second fluid flow path as a result of the first fluid flow path receiving the initial volume of blood from the patient such that the initial volume of blood is sequestered and such that fluid communication is established between the lumen-containing device and a sample vessel via the second fluid flow path, the same vessel containing a culture media; and

receiving a subsequent blood sample into the sample vessel.

67.     The Accused Products practice a method of using a sample procurement device to obtain a blood sample from a patient with reduced contamination to reduce false results in culture testing of the blood sample. For example, Kurin's website states that the Accused Products are intended "for use as a blood collection system" that "sidelines the initial 0.15ml of blood, which may

14

contain contaminants from the patient's own skin." Exhibit 6 at 2, 5. Kurin's website notes that, "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion, the Kurin jet is ready to provide an optimal blood sample for culture." Exhibit 6 at 2. Kurin's website further explains that once the Accused Products are "attached to a vacuum source," an initial volume of blood is "immediately sidelined into the waste channel," after which "fresh blood is allowed to enter the sample channel for instantly improved specimen collection." Exhibit 6 at 2.

68.     The Accused Products practice a method that involves establishing fluid communication between a lumen-containing device and the patient, as shown in the following image from Kurin's website:



https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as working with "all blood culture collection methods," including "venipuncture," "syringe draws," and "freshly-placed PIVs," and notes that the Accused Products work "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion." Exhibit 6 at 2-4.

69.     The Accused Products further practice a method that entails establishing fluid communication between the lumen-containing device and a first fluid flow path. For example, Kurin's website states that "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion, the Kurin jet is ready to provide an optimal blood sample for culture." Exhibit 6 at 2. Kurin's website further explains that once the Accused Products are "attached to a vacuum source,"

an initial volume of blood is "immediately sidelined into the waste channel," after which "fresh blood is allowed to enter the sample channel for instantly improved specimen collection." Exhibit 6 at 2. Furthermore, as shown in the following exemplary images from Kurin's website, the Accused Products include a lumen-containing device that is in fluid communication with a first fluid flow path of the Kurin Jet device:

 

https://www.kurin.com/kurin-jet/.

70.    Further, Kurin's website describes the Accused Products as working with "all blood culture collection methods," including "venipuncture," "syringe draws," and "freshly-placed PIVs," and notes that the Accused Products work "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion." Exhibit 6 at 2-4. Kurin's website further describes the Accused Products as "blood culture collection set[s]" that work with "all blood culture collection methods," and describes the device as working "[o]nce attached to a vacuum source, such as a blood culture bottle or syringe." Exhibit 6 at 1-3.

71.     The Accused Products further practice a method that involves receiving an initial volume of blood from the patient, as shown in the following series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:





https://www.kurin.com/kurin-jet/. Further, as Kurin's website explains, the Accused Products are configured to operate in at least two distinct states. In the first state, which begins once the Accused Products are "attached to a vacuum source, such as a blood culture bottle or syringe, the initial 0.15mL of blood that often contains skin contaminants is immediately sidelined into the waste channel." Exhibit 6 at 2.

72.     The Accused Products further practice a method that involves transitioning at a junction between the first fluid flow path and a second fluid flow path as a result of the first fluid flow path receiving the initial volume of blood from the patient such that the initial volume of blood is sequestered and such that fluid communication is established between the lumen-containing device and a

COMPLAINT

sample vessel via the second fluid flow path, the sample vessel containing a culture media, as shown in the following series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:







https://www.kurin.com/kurin-jet/. Further, as Kurin's website explains, the Accused Products are configured to operate in at least two distinct states. In the first state, which begins once the Accused Products are "attached to a vacuum source, such as a blood culture bottle or syringe, the initial 0.15mL of blood that often contains skin contaminants is immediately sidelined into the waste channel." Exhibit 6 at 2. As Kurin's website further explains, during the second state of operation, which takes place "[o]nce the waste channel is filled, fresh blood is allowed to enter the sample channel for instantly improved specimen collection." *Id.* Moreover, Kurin's website notes that the Accused Products are sold in "Venipuncture Collection Sets" along with "BD Bactec" bottles, Exhibit 6 at 4, which provide "a full line of blood culture media developed specifically for the detection of aerobes, anaerobes, yeast, fungi and mycobacteria to help improve time to detect and organism recovery from both adult and pediatric patients." https://www.bd.com/en-us/products-and-solutions/solutions/capabilities/bd-bactec-blood-culture-media.

73.    The Accused Products further practice a method that involves receiving a subsequent blood sample into the sample vessel, as shown in the following images from Kurin's website:

 

19

https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as working with "all blood culture collection methods," including "venipuncture," "syringe draws," and "freshly-placed PIVs," and notes that the Accused Products work "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion." Exhibit 6 at 2-4. Kurin's website further describes the Accused Products as "blood culture collection set[s]" that work with "all blood culture collection methods," and describes the device as working "[o]nce attached to a vacuum source, such as a blood culture bottle or syringe." *Id.* at 1-3. As Kurin's website further explains, during the second state of operation, which takes place "[o]nce the waste channel is filled, fresh blood is allowed to enter the sample channel for instantly improved specimen collection." *Id.* at 2.

74.   Kurin also actively induces and/or contributes to, and has induced and/or contributed to, infringement of the '002 Patent under 35 U.S.C. §§ 271(b) and (c), either literally or under the doctrine of equivalents, and continues to do so. Kurin had knowledge of the '002 Patent no later than February 23, 2023, and notice of its infringement thereof. Kurin actively induces its customers to purchase and use the Accused Products such that the customers directly infringe the '002 Patent. For example, Kurin instructs customers on its website to use the Accused Products with a variety of "blood culture collection methods," explaining how the Accused Products can be connected "with a butterfly needle or peripheral IV insertion" in order to "gain[] venous access," and instructs customers to "attach[] [the Accused Products] to a vacuum source, such as a blood culture bottle or syringe." (*see, e.g.*, Exhibit 6 at 2). Kurin further assists customers in installing, maintaining, testing, and using the Accused Products such that customers directly infringe the '002 Patent.

75.   Kurin's infringement of the '002 Patent has damaged and will continue to damage Magnolia. Magnolia is entitled to recover damages adequate to compensate for Kurin's infringement, which cannot be less than a reasonable

royalty, together with interest and costs fixed by the Court under 35 U.S.C. § 284, including past damages under 35 U.S.C. § 287.

<b><u>COUNT II</u></b>

<b>Infringement of the '053 Patent</b>

76.    Magnolia incorporates the allegations of all foregoing Paragraphs as if fully restated herein.

77.    Kurin directly infringes, and has directly infringed, all claims of the '053 Patent, either literally or under the doctrine of equivalents, by, without authority, consent, right, or license, making, using, offering to sell, or selling within the United States, or importing into the United States, the Accused Products.

78.    As detailed below, the Accused Products practice all elements of at least claim 1 of the '053 Patent. Kurin's infringement of claim 1 is representative of infringement of all Kurin's Accused Products.

79.    Among the claims of the '053 Patent, claim 1 discloses:

A device for obtaining a blood sample with reduced contamination from a patient to reduce false results in culture testing of the blood sample, the device comprising:

a first fluid flow path configured to receive a first volume of blood from the patient;

a second fluid flow path configured to be placed in fluid communication with a sample vessel, the sample vessel containing a culture media; and

a junction in fluid communication with the first fluid flow path and the second fluid flow path, the device configured to automatically transition at the junction from a first state, in which the first volume of blood can flow from the patient via the first fluid flow path, to a second state, in which a second volume of blood can flow from the patient via the second fluid flow path, a portion of the first volume of blood being sequestered in the first fluid flow path when the device is in the second state,

whereby sequestering the portion of the first volume of blood sequesters contaminants present in the first volume of blood, thereby reducing contamination in the blood used as the blood sample in the culture testing.

80.    The Accused Products include a device for obtaining a blood sample with reduced contamination from a patient to reduce false results in culture testing of the blood sample. For example, Kurin's website states that the Accused Products are intended "for use as a blood collection system" that "sidelines the initial 0.15ml of blood, which may contain contaminants from the patient's own skin." Exhibit 6 at 2, 5. Kurin's website further explains that once the Accused Products are "attached to a vacuum source," an initial volume of blood is "immediately sidelined into the waste channel," after which "fresh blood is allowed to enter the sample channel for instantly improved specimen collection." *Id.* at 2. Kurin's website notes that the Accused Products are designed to work "toward eliminating preventable blood culture contamination" and that they sideline contaminants to "ensur[e] that the best possible blood specimen reaches the collection bottles." Exhibit 6 at 1.

81.    The Accused Products include a device for obtaining a blood sample comprising a first fluid flow path configured to receive a first volume of blood from the patient, as shown in the following image from Kurin's website:



https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as working with "all blood culture collection methods," including "venipuncture," "syringe draws," and "freshly-placed PIVs," and notes that the

Accused Products work "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion." Exhibit 6 at 2-4. Kurin's website further explains that once the Accused Products are "attached to a vacuum source, such as a blood culture bottle or syringe, the initial 0.15mL of blood that often contains skin contaminants is immediately sidelined into the waste channel." Exhibit 6 at 2.

82.    The Accused Products further include a device comprising a second fluid flow path configured to be placed in fluid communication with a sample vessel, the sample vessel containing a culture media, as shown in the following exemplary images from Kurin's website:

 

https://www.kurin.com/kurin-jet/. Further, as Kurin's website explains, the Accused Products are configured to operate in at least two distinct states. In the first state, which begins once the Accused Products are "attached to a vacuum source, such as a blood culture bottle or syringe, the initial 0.15mL of blood that often contains skin contaminants is immediately sidelined into the waste channel." Exhibit 6 at 2. As Kurin's website further explains, during the second state of operation, which takes place "[o]nce the waste channel is filled, fresh blood is allowed to enter the sample channel for instantly improved specimen collection." *Id.* Moreover, Kurin's website notes that the Accused Products are sold in "Venipuncture Collection Sets" along with "BD Bactec" bottles, Exhibit 6 at 4, which provide "a full line of blood culture media developed specifically for the

detection of aerobes, anaerobes, yeast, fungi and mycobacteria to help improve time to detect and organism recovery from both adult and pediatric patients." https://www.bd.com/en-us/products-and-solutions/solutions/capabilities/bd-bactec-blood-culture-media. Further, Kurin's website describes the Accused Products as "blood culture collection set[s]" that work with "all blood culture collection methods." *Id.* at 1, 3.

83.    The Accused Products further include a device for obtaining a blood sample with reduced contamination comprising a junction in fluid communication with the first fluid flow path and the second fluid flow path, the device configured to automatically transition at the junction from a first state, in which the first volume of blood can flow from the patient via the first fluid flow path, to a second state, in which a second volume of blood can flow from the patient via the second fluid flow path, a portion of the first volume of blood being sequestered in the first fluid flow path when the device is in the second state, as shown in the following series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:



COMPLAINT



https://www.kurin.com/kurin-jet/. Further, as Kurin's website explains, the Accused Products are configured to operate in at least two distinct states. In the first state, which begins once the Accused Products are "attached to a vacuum source, such as a blood culture bottle or syringe, the initial 0.15ml of blood that often contains skin contaminants is immediately sidelined into the waste channel." Exhibit 6 at 2. As Kurin's website further explains, during the second state of operation, which takes place "[o]nce the waste channel is filled, fresh blood is allowed to enter the sample channel for instantly improved specimen collection." *Id.*

84.    The Accused Products further include a device for obtaining a blood sample with reduced contamination whereby sequestering the portion of the first volume of blood sequesters contaminants present in the first volume of blood,

thereby reducing contamination in the blood used as the blood sample in the culture testing, as shown in the following images from Kurin's website:




https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as working as part of "blood culture collection sets" that "sideline[] the initial 0.15ml of blood, which may contain contaminants from the patient's own skin, ensuring that the best possible blood specimen reaches the collection bottles." Exhibit 6 at 1. As Kurin's website further explains, during the second state of operation, which takes place "[o]nce the waste channel is filled, fresh blood is allowed to enter the sample channel for instantly improved specimen collection." *Id.* at 2.

85.    Kurin also actively induces and/or contributes to, and has induced and/or contributed to, infringement of the '053 Patent under 35 U.S.C. §§ 271(b) and (c), either literally or under the doctrine of equivalents, and continues to do so. Kurin had knowledge of the '053 Patent no later than February 23, 2023, and notice of its infringement thereof. Kurin actively induces its customers to purchase and use the Accused Products such that the customers directly infringe the '053 Patent. For example, Kurin instructs customers on its website to use the Accused Products with a variety of "blood culture collection methods," explaining how the Accused Products can be connected "with a butterfly needle or peripheral IV

insertion" in order to "gain[] venous access," and instructs customers to "attach[] [the Accused Products] to a vacuum source, such as a blood culture bottle or syringe." (*see, e.g.*, Exhibit 6 at 2). Kurin further assists customers in installing, maintaining, testing, and using the Accused Products such that customers directly infringe the '053 Patent.

86.    Kurin's infringement of the '053 Patent has damaged and will continue to damage Magnolia. Magnolia is entitled to recover damages adequate to compensate for Kurin's infringement, which cannot be less than a reasonable royalty, together with interest and costs fixed by the Court under 35 U.S.C. § 284, including past damages under 35 U.S.C. § 287.

## COUNT III

### Infringement of the '081 Patent

87.    Magnolia incorporates the allegations of all foregoing Paragraphs as if fully restated herein.

88.    Kurin directly infringes, and has directly infringed, all claims of the '081 Patent, either literally or under the doctrine of equivalents, by, without authority, consent, right, or license, making, using, offering to sell, or selling within the United States, or importing into the United States, the Accused Products.

89.    As detailed below, the Accused Products practice all elements of at least claim 1 of the '081 Patent. Kurin's infringement of claim 1 is representative of infringement of all Kurin's Accused Products.

90.    Among the claims of the '081 Patent, claim 1 discloses:

A fluid control device, the device comprising:

a housing having an inlet fluidically coupleable to a patient and an outlet fluidically coupleable to a fluid collection device, the housing defining at least a portion of each of a containment channel and a sampling channel between the inlet and the outlet;

COMPLAINT

a selectively permeable blood barrier, the blood barrier disposed in the housing between the containment channel and the outlet; and

a moveable plug disposed in the housing and configured to obstruct a flow path between the inlet and the outlet via the sampling channel when in first position,

the blood barrier configured to allow a gas to flow through the blood barrier in response to a pressure differential between the inlet and the outlet, thereby allowing a volume of blood to flow into the containment channel,

in response to contact with at least a portion of the volume of the blood in the containment channel, the blood barrier configured to allow the pressure differential in at least a portion of the sampling channel between the moveable plug and the outlet to build to an extent sufficient to move the moveable plug from the first position to a second position in which the moveable plug allows blood to flow through the sampling channel to the outlet.

91.     The Accused Products are fluid control devices. For example, Kurin's website states that the Accused Products are "for use as a blood collection system" that "sidelines the initial 0.15ml of blood, which may contain contaminants from the patient's own skin." Exhibit 6 at 1, 5.

92.     The Accused Products include a housing having an inlet fluidically coupleable to a patient, as shown in the following image from Kurin's website:



https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as working with "all blood culture collection methods," including "venipuncture," "syringe draws," and "freshly-placed PIVs," and notes that the

Accused Products work "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion." Exhibit 6 at 2-4.

93.    The Accused Products further include a housing having an outlet fluidically coupleable to a fluid collection device, as shown in the following exemplary images from Kurin's website:



https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as "blood culture collection set[s]" that work with "all blood culture collection methods," and describes the device as working "[o]nce attached to a vacuum source, such as a blood culture bottle or syringe." Exhibit 6 at 2-3.

94.    The Accused Products further include a housing defining at least a portion of each of a containment channel and a sampling channel between the inlet and the outlet. For example, and as depicted below, a video titled "Kurin Jet in Action" available on Kurin's website describes the Accused Products as containing both a "waste channel" (top image) and a "sample channel" (bottom image):

COMPLAINT

https://www.kurin.com/kurin-jet/; Exhibit 6 at 2.

95.    The Accused Products further include a selectively permeable blood barrier disposed in the housing between the containment channel and the outlet, as shown on the right-hand side of the following screenshot image from the video titled "Kurin Jet in Action" available on Kurin's website:



https:///www.kurin.com/kurin-jet/.

96.    The Accused Products further include a moveable plug disposed in the housing and configured to obstruct a flow path between the inlet and the outlet via the sampling channel when in first position, as shown on the left-hand side of the

COMPLAINT

following screenshot image from the video titled "Kurin Jet in Action" available on Kurin's website:



https://www.kurin.com/kurin-jet/.

97.    The Accused Products further include a blood barrier configured to allow a gas to flow through the blood barrier in response to a pressure differential between the inlet and the outlet, thereby allowing a volume of blood to flow into the containment channel, as shown in the following screenshot image from the video titled "Kurin Jet in Action" available on Kurin's website:



https://www.kurin.com/kurin-jet/.

98.    The Accused Products further include a blood barrier configured to allow, in response to contact with at least a portion of the volume of the blood in the containment channel, the pressure differential in at least a portion of the

sampling channel between the moveable plug and the outlet to build to an extent sufficient to move the moveable plug from the first position to a second position in which the moveable plug allows blood to flow through the sampling channel to the outlet, as shown in the following series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:

COMPLAINT

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19



20
21
22
23
24
25
26
27
28



COMPLAINT

https://www.kurin.com/kurin-jet/.

99.     Kurin also actively induces and/or contributes to, and has induced and/or contributed to, infringement of the '081 Patent under 35 U.S.C. §§ 271(b) and (c), either literally or under the doctrine of equivalents, and continues to do so. Kurin had knowledge of the '081 Patent no later than February 23, 2023, and notice of its infringement thereof. Kurin actively induces its customers to purchase and use the Accused Products such that the customers directly infringe the '081 Patent. For example, Kurin instructs customers on its website to use the Accused Products with a variety of "blood culture collection methods," explaining how the Accused Products can be connected "with a butterfly needle or peripheral IV insertion" in order to "gain[] venous access," to patients, and instructs customers to "attach[] [the Accused Products] to a vacuum source, such as a blood culture bottle or syringe" to collect a "blood sample for culture." (*see, e.g.*, Exhibit 6). Kurin further assists customers in installing, maintaining, testing, and using the Accused Products such that customers directly infringe the '081 Patent.

100.    Kurin's infringement of the '081 Patent has damaged and will continue to damage Magnolia. Magnolia is entitled to recover damages adequate to compensate for Kurin's infringement, which cannot be less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284, including past damages under 35 U.S.C. § 287.

## COUNT IV

### Infringement of the '863 Patent

101.    Magnolia incorporates the allegations of all foregoing Paragraphs as if fully restated herein.

102.    Kurin directly infringes, and has directly infringed, all claims of the '863 Patent, either literally or under the doctrine of equivalents, by, without authority, consent, right, or license, making, using, offering to sell, or selling within the United States, or importing into the United States the Accused Products.

103.    As detailed below, the Accused Products practice all elements of at least claim 1 of the '863 Patent. Kurin's infringement of claim 1 is representative of infringement of all Kurin's Accused Products.

104.    Among the claims of the '863 Patent, claim 1 discloses:

A fluid control device, the device comprising:

> a housing having an inlet fluidically coupleable to a patient and an outlet fluidically coupleable to a fluid collection device, the housing at least partially defining each of a containment channel and a sampling channel between the inlet and the outlet;

> a selectively permeable blood barrier at a proximal end portion of the containment channel, the blood barrier configured to allow a gas to flow from the containment channel to the outlet in response to a pressure differential between the inlet and the outlet such that a volume of blood is drawn from the patient and into the containment channel; and

> a moveable plug between a portion of the containment channel and sampling channel, the moveable plug configured to move from a first position to a second position in response to a pressure differential in at least a portion of the sampling channel between the moveable plug and the outlet exceeding a threshold pressure as a result of the volume of blood in the containment channel, the moveable plug configured to obstruct a distal end portion of the sampling channel when in the first position but not in the second position to allow blood to flow from the patient through the sampling channel to the outlet.

105.    The Accused Products are fluid control devices. For example, Kurin's website states that the Accused Products are "for use as a blood collection system" that "sidelines the initial 0.15ml of blood, which may contain contaminants from the patient's own skin." Exhibit 6 at 1, 5.

106.   The Accused Products include a housing having an inlet fluidically coupleable to a patient, as shown in the following image from Kurin's website:



https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as working with "all blood culture collection methods," including "venipuncture," "syringe draws," and "freshly-placed PIVs," and notes that the Accused Products work "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion." Exhibit 6 at 2-4.

107.   The Accused Products further include a housing having an outlet fluidically coupleable to a fluid collection device, as shown in the following exemplary images from Kurin's website:

 

https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as "blood culture collection set[s]" that work with "all blood culture collection methods," and describes the device as working "[o]nce attached to a vacuum source, such as a blood culture bottle or syringe." Exhibit 6 at 2-3.

36

108.   The Accused Products further include a housing defining at least a portion of each of a containment channel and a sampling channel between the inlet and the outlet. For example, a video titled "Kurin Jet in Action" available on Kurin's website depicts, as shown in the below screenshot images, a housing containing two channels described in the video's voiceover as a "waste channel" and a "sample channel":





Exhibit 6 at 2; https://www.kurin.com/kurin-jet/.

109.    The Accused Products further include a selectively permeable blood barrier at a proximal end portion of the containment channel, as shown in the following screenshot image from the video titled "Kurin Jet in Action" available on Kurin's website:



https://www.kurin.com/kurin-jet/.

110.    The Accused Products further include a blood barrier configured to allow a gas to flow from the containment channel to the outlet in response to a pressure differential between the inlet and the outlet such that a volume of blood is drawn from the patient and into the containment channel, as shown in the following series of screenshot image s from the video titled "Kurin Jet in Action" available on Kurin's website:





https://www.kurin.com/kurin-jet/.

111.   The Accused Products further include a blood barrier configured to allow a gas to flow from the containment channel to the outlet in response to a pressure differential between the inlet and the outlet such that a volume of blood is drawn from the patient and into the containment channel, as shown in the

following series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:





https://www.kurin.com/kurin-jet/.

112.   The Accused Products further include a moveable plug between a portion of the containment channel and sampling channel, the moveable plug configured to move from a first position to a second position in response to a pressure differential in at least a portion of the sampling channel between the moveable plug and the outlet exceeding a threshold pressure as a result of the volume of blood in the containment channel, the moveable plug configured to

obstruct a distal end portion of the sampling channel when in the first position but not in the second position to allow blood to flow from the patient through the sampling channel to the outlet, as shown on the left-hand side of the following screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:





https://www.kurin.com/kurin-jet/.

113.   Kurin also actively induces and/or contributes to, and has induced and/or contributed to, infringement of the '863 Patent under 35 U.S.C. §§ 271(b) and (c), either literally or under the doctrine of equivalents, and continues to do so. Kurin has knowledge of the '863 Patent because it knew of the application from which the patent issued no later than February 23, 2023, and notice of its infringement thereof. Kurin actively induces its customers to purchase and use the Accused Products such that the customers directly infringe the '863 Patent. For example, Kurin instructs customers on its website to use the Accused Products with a variety of "blood culture collection methods," explaining how the Accused Products can be connected "with a butterfly needle or peripheral IV insertion" in order to "gain[] venous access," and instructs customers to "attach[] [the Accused Products] to a vacuum source, such as a blood culture bottle or syringe." (*see, e.g.*, Exhibit 6 at 2). Kurin further assists customers in installing, maintaining, testing, and using the Accused Products such that customers directly infringe the '863 Patent.

114.   Kurin's infringement of the '863 Patent has damaged and will continue to damage Magnolia. Magnolia is entitled to recover damages adequate to compensate for Kurin's infringement, which cannot be less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284, including past damages under 35 U.S.C. § 287.

## COUNT V

### Infringement of the '709 Patent

115.   Magnolia incorporates the allegations of all foregoing Paragraphs as if fully restated herein.

116.   Kurin directly infringes, and has directly infringed, all claims of the '709 Patent either literally or under the doctrine of equivalents, by, without authority, consent, right, or license, making, using, offering to sell, or selling

within the United States, or importing into the United States, the Accused Products.

117. As detailed below, the Accused Products practice all elements of at least claim 1 of the '709 Patent. Kurin's infringement of claim 1 is representative of infringement of all Kurin's Accused Products.

118. Among the claims of the '709 Patent, claim 1 discloses:

A fluid control device, the device comprising:

a housing having an inlet fluidically coupleable to a blood source and an outlet fluidically coupleable to a fluid collection device, the housing defining at least a portion of each of a containment channel and a sampling channel between the inlet and the outlet;

a selectively permeable blood barrier, the blood barrier fluidically coupled to the containment channel and the outlet; and

a valve disposed at least partially in the housing and configured to substantially obstruct a flow path between the inlet and the outlet when in a first state,

the blood barrier configured to allow a gas to flow through the blood barrier in response to a pressure differential between the inlet and the outlet, thereby allowing a volume of blood to flow into the containment channel,

in response to contact with at least a portion of the volume of the blood in the containment channel, the blood barrier configured to allow the pressure differential in at least a portion of the sampling channel between the valve and the outlet to build to an extent sufficient to transition the valve from the first state to a second state in which the valve allows blood to flow through the sampling channel to the outlet.

119. The Accused Products are fluid control devices. For example, Kurin's website states that the Accused Products are "for use as a blood collection system" that "sidelines the initial 0.15ml of blood, which may contain contaminants from the patient's own skin." Exhibit 6 at 1, 5.

120.   The Accused Products include a housing having an inlet fluidically coupleable to a blood source, as shown in the following image from Kurin's website:



https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as working with "all blood culture collection methods," including "venipuncture," "syringe draws," and "freshly-placed PIVs," and notes that the Accused Products work "[u]pon gaining venous access with a butterfly needle or peripheral IV insertion." Exhibit 6 at 2-4.

121.   The Accused Products further include a housing having an outlet fluidically coupleable to a fluid collection device, as shown in the following exemplary images from Kurin's website:

 

https://www.kurin.com/kurin-jet/. Further, Kurin's website describes the Accused Products as "blood culture collection set[s]" that work with "all blood culture

collection methods," and describes the device as working "[o]nce attached to a vacuum source, such as a blood culture bottle or syringe." Exhibit 6 at 2-3.

122.   The Accused Products further include a housing defining at least a portion of each of a containment channel and a sampling channel between the inlet and the outlet. For example, and as depicted below, a video titled "Kurin Jet in Action" available on Kurin's website describes the Accused Products as containing both a "waste channel" (top image) and a "sample channel" (bottom image):





Exhibit 6 at 2; https://www.kurin.com/kurin-jet/.

123.   The Accused Products further include a selectively permeable blood barrier fluidically coupled to the containment channel and the outlet, as shown on

the right-hand side of the following series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:





https://www.kurin.com/kurin-jet/.

124. The Accused Products further include a valve disposed at least partially in the housing and configured to substantially obstruct a flow path between the inlet and the outlet when in a first state, as shown on the left-hand side of the following series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:





https://www.kurin.com/kurin-jet/.

47

125.   The Accused Products further include a blood barrier configured to allow a gas to flow through the blood barrier in response to a pressure differential between the inlet and the outlet, thereby allowing a volume of blood to flow into the containment channel, as shown in the following series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:





https://www.kurin.com/kurin-jet/. Further, as Kurin's website explains, once the Accused Products are "attached to a vacuum source, such as a blood culture bottle

48

or syringe, the initial 0.15mL of blood that often contains skin contaminants is immediately sidelined into the waste channel." Exhibit 6 at 2.

126.   The Accused Products further include a blood barrier configured to allow, in response to contact with at least a portion of the volume of the blood in the containment channel, the pressure differential in at least a portion of the sampling channel between the valve and the outlet to build to an extent sufficient to transition the valve from the first state to a second state in which the valve allows blood to flow through the sampling channel to the outlet, as shown in the series of screenshot images from the video titled "Kurin Jet in Action" available on Kurin's website:





COMPLAINT



https://www.kurin.com/kurin-jet/. Further, as Kurin's website explains, the Accused Products are configured to operate in at least two distinct states. In the first state, which begins once the Accused Products are "attached to a vacuum source, such as a blood culture bottle or syringe, the initial 0.15mL of blood that often contains skin contaminants is immediately sidelined into the waste channel." Exhibit 6 at 2. As Kurin's website further explains, during the second state of operation, which takes place "[o]nce the waste channel is filled, fresh blood is allowed to enter the sample channel for instantly improved specimen collection." *Id.*

127.   Kurin also actively induces and/or contributes to, and has induced and/or contributed to, infringement of the '709 Patent under 35 U.S.C. §§ 271(b) and (c), either literally or under the doctrine of equivalents, and continues to do so. Kurin actively induces its customers to purchase and use the Accused Products such that the customers directly infringe the '709 Patent. For example, Kurin instructs customers on its website to use the Accused Products with a variety of "blood culture collection methods," explaining how the Accused Products can be connected "with a butterfly needle or peripheral IV insertion" in order to "gain[] venous access," to patients, and instructs customers to "attach[] [the Accused Products] to a vacuum source, such as a blood culture bottle or syringe" to collect a "blood sample for culture." (*see, e.g.*, Exhibit 6 at 2). Kurin further assists

customers in installing, maintaining, testing, and using the Accused Products such that customers directly infringe the '709 Patent.

128.   Kurin's infringement of the '709 Patent has damaged and will continue to damage Magnolia. Magnolia is entitled to recover damages adequate to compensate for Kurin's infringement, which cannot be less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284, including past damages under 35 U.S.C. § 287.

# **PRAYER FOR RELIEF**

WHEREFORE, Magnolia respectfully requests that this Court grant:

A.    A judgment that the Asserted Patents are valid and enforceable;

B.    A judgment that Kurin has infringed, either literally or under the doctrine of equivalents, one or more of the claims of the Asserted Patents;

C.    A judgment that awards Magnolia all appropriate damages for the infringement that has occurred, and any continuing or future infringement of the Asserted Patents, up until the date such judgment is entered, including pre- and/or post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284, and an accounting adequate to compensate Magnolia for Kurin's infringement;

D.    A judgment that Kurin's infringement of the Asserted Patents has been deliberate and willful;

E.    A judgment awarding Magnolia enhanced damages up to three times their amount pursuant to 35 U.S.C. § 284;

F.    A preliminary and/or permanent injunction enjoining Kurin, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from further infringement of the Asserted Patents;

G.    A declaration that this case is exceptional within the meaning of 35 U.S.C. § 285 and that Magnolia be awarded its reasonable attorneys' fees against Kurin that Magnolia incurs in prosecuting this action;

H.    An award to Magnolia of costs and expenses that it incurs in prosecuting this action; and

I.    A judgment that Magnolia be awarded such further relief at law or in equity as the Court may deem just and proper.

COMPLAINT

**<u>JURY DEMAND</u>**

Magnolia requests a jury trial as to all issues that are triable by a jury in this action.

Dated: March 4, 2024

Respectfully submitted,

<u>s/ Ashok Ramani</u>

Ashok Ramani (SBN 200020)
Micah G. Block (SBN 270712)
Serge A. Voronov (SBN 298655)
Ian Hogg (SBN 313924)
Elaine M. Andersen (SBN 340247)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Tel:   (650) 752-2000
Fax:   (650) 752-2111
ashok.ramani@davispolk.com
micah.block@davispolk.com
serge.voronov@davispolk.com
ian.hogg@davispolk.com
elaine.andersen@davispolk.com

*Attorneys for Plaintiff*
*Magnolia Medical Technologies, Inc.*